**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Leland Oil & Gas, LLC, and K and R Roustabout, Inc., | ) ) ) | |
| Plaintiffs, | ) ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT** |
| vs. | ) ) | |
| Marsha Azar and Saul Azar dba Illinois Energy, and Bensun Energy, LLC, | ) ) ) | |
| Defendants. | ) ) | Case No. 1:14-cv-161 |

## FINDINGS OF FACT

### The parties and the wells

1.       Plaintiffs Leland Oil & Gas, LLC ("Leland Oil") and K and R Roustabout, Inc. ("K&R Roustabout") are North Dakota limited liability companies having their principal business office in Killdeer, North Dakota.  Both are owned and operated by Gregory Krueger ("Krueger").  (Exs. P1, P4).

Leland Oil is Krueger's production company.  It owns a small number of oil wells in addition to those at issue in this case.  K&R Roustabout provides labor for operating oil wells and storage facilities, including those owned by Leland Oil.  In addition to these companies, Krueger also owns a well service company that does completion and maintenance work on oil wells, including downhole work.  He also owns a company that takes care of natural gas engines that provide power to pumping units that do not have electrical service.

All told, Krueger has some 25 years of oilfield experience as a laborer, an owner and operator of his various businesses, and as a consultant with respect to well servicing and workovers.

1

(Tr. Tr. 24-28; Ex. P2).   He is not, however, a petroleum engineer or geologist.

2.       Defendant Bensun Energy, LLC ("Bensun Energy") is a Montana limited liability company having its principal business office in Sidney, Montana.  (Exs. P1, P4).

3.       Defendants Saul and Marsha Azars (collectively the "Azars") are husband and wife residing in Chicago, Illinois.    Saul Azar is an investor and a manager of real estate.  (Tr. Tr. 102). He conducted his business in the State of North Dakota under the name "Illinois Energy."  (Exs. P1, P4, P8, P9, P10, P11).

4.       In June 2012, Leland Oil and Bensun Energy acquired the Azars' ownership interest in two oil and gas wells located in North Dakota, specifically the Davis State 34-26 ("Davis State") and the Sullivan 23-1 ("Sullivan") along with certain lease rights allowing them to produce the wells, with each acquiring a 50% undivided interest in the wells and lease rights.  (Ex. P11; Tr. Tr. 28-29).       5.       The acquisition of the two wells and lease rights was paid for by Leland Oil. Bensun Energy's nonpayment of its share of the acquisition and certain post-acquisition costs led to the claim in this case by Leland Oil against Bensun Energy that was resolved by the entry of a default judgment.  Shortly before trial and in satisfaction of that judgment, Leland Oil acquired an assignment from Bensun Energy of its 50% undivided share in the two wells and associated lease rights along with its share of any claim that it may have against the Azars arising out of the purchase of the two wells, including the claim held in common with Leland Oil against the Azars in this action.  (Ex. 28).  At trial, and without objection by the Azars, Leland Oil asserted not only the rights it held initially but also those it acquired from Bensun Energy and that Leland Oil had financed. Consequently, when reference is made below to Leland Oil's claim for breach of contract for lost production from the Davis State and Sullivan wells, it includes that which was held by Bensun

Energy in common with Leland Oil.

6. During the times relevant to this action, the Azars owned the McMahen State 1 ("McMahen State") well. (Ex. P1, P4, P13).[1]

**K&R's claim for money due on services rendered**

7. Two claims were presented for trial in this case. One was K&R Roustabout's claim for money owed by the Azars for work on the McMahen well. At the beginning of trial, the parties stipulated that judgment could be entered in favor of K&R Roustabout and against the Azars in the amount of $19,552.80. The remainder of what follows addresses the second claim, which is Leland Oil's claim for breach of contract. (Tr. Tr. 4-6; Ex. D2).

**Leland Oil's breach of contract claim and the grant of partial summary judgment**

8. Leland Oil alleged in its complaint that the Azars breached the agreement pursuant to which Leland Oil and Bensun Energy acquired the Davis State and Sullivan by failing to complete and file a *Notice of Transfer of Oil and Gas Wells – Form 15* ("notice of transfer") with the North Dakota Industrial Commission ("NDIC") following the completion of the sale of the two wells. Leland Oil claimed that, until a notice of transfer was filed and approved by the NDIC, it was prohibited from being able to commercially produce the two wells and that it suffered significant damages as a consequence.

9. Prior to trial, Leland Oil moved for partial summary judgment on the issue of whether the Azars were legally obligated to complete and file a notice of transfer with the NDIC. After approximately three months with no response by the Azars, the court on January 22, 2016, entered

---

[1] Throughout the record, the name for this well has been spelled different ways. This appears to be the correct spelling and the one used by the NDIC. (Ex. P13).

an order granting the motion for partial summary judgment on the issue of liability as follows:

> Defendants Marsha and Saul Azar d/b/a as Illinois Energy are legally obligated to complete and file all necessary documents with the North Dakota Industrial Commission to effectuate a change of operator of the Sullivan 23-1 and Davis State 34-36 wells to Leland, including but not limited to, Notice of Transfer of Oil and Gas Wells-Form 15[.]

(Doc. No. 44, Ex. P5). The foregoing language parroted what Leland Oil had requested in its motion. Notably, no determination was made, however, as to when the Azars became liable in terms of having failed to provide a notice of transfer. This was because Leland Oil did not address that in its motion. Consequently, while the primary focus of the trial with respect to Leland Oil's lack-of-production claim was damages, one of the issues that remained to be determined was when the Azars' liability for failing to have timely provided a notice of transfer first arose because it is material to what damages can be awarded. Unfortunately, the determination of when the Azars were obligated to provide the notice of transfer requires consideration of what the parties agreed to, which is not entirely clear, along with possibility that the initial understandings and obligations of the parties were altered by the subsequent course of performance or lack of it.

### When the Azars' liability arose and its impact on any damage calculation

10.     In large part, the agreement for the sale of the two wells as finally consummated appears to have been made orally. While there was a May 11, 2012 written offer by Bensun Energy to purchase the wells that was countersigned by the Azars, that writing cannot be relied upon for what the final agreement was for several reasons, including: (1) the fact that the written offer expressly contemplated a further more formal agreement; (2) no mention was made of Leland Oil in the written offer and the fact it became a party to the ultimate agreement; (3) no date was specified in the written offer for a closing; and (4) a number of the terms in the written offer subsequently changed, including the purchase price, which was $100,000 in the written offer but

changed to $75,000 and payment by a promissory note and not cash. (Exs. P8, P9, P11).

That being said, it is clear an agreement was reached at some point as evidenced by the subsequent performance of the parties, including the Azars' assignment of their interests in the two wells to Leland Oil and Bensun Energy in exchange for: (1) a promissory note given by the purchasers in the amount of $75,000; and (2) the promise of Leland Oil and Bensun Energy to have K&R Roustabout perform certain rehabilitative work on the McMahen State well that would be paid for by the Azars. (Exs. P1, P4, P8, P9, P11; Tr. Tr. 28-34, 69-70).

11.    In furtherance of this agreement, the Azars did assign their interest in the Davis State and Sullivan wells to Leland Oil and Bensun Energy by way of a written assignment effective as of June 15, 2012, with Leland Oil and Bensun Energy each receiving a 50% undivided interest in the acquired property. In exchange for the assignment, Bensun Energy and Leland Oil gave the Azars a promissory note in the amount of $75,000 on the same date. (Exs. P4; P9; P11). As noted above, this represented a substantial deviation from the terms set forth in the earlier written offer made by Bensun Energy in that Leland Oil was now formally involved, the purchase price had dropped, and, instead of full cash payment being made, only a note was given.

12.    Under the terms of the promissory note, Leland Oil and Bensun Energy were to have made payments in equal monthly installments beginning 45 days from the date of the note. However, no monthly installments were ever made. It was not until November 1, 2013, almost seventeen months after the assignment, that Leland Oil forwarded a check to the Azars in the amount of $75,000, which was cashed by the Azars on November 6, 2013. (Exs. P4, P9, P12).

13.    Leland Oil claims that the Azars were required to provide a notice of transfer of the

wells for filing with the NDIC at the time of closing, relying upon the provision in Bensun Energy's initial written offer. However, for reasons already expressed, the written offer cannot be relied upon for what the terms of the ultimate agreement was. Further, the closing of sorts that took place when the written assignment of interests was exchanged for the promissory note went forward notwithstanding the lack of completion of a notice of transfer.

14. The Azars did complete a form notice of transfer later in July 2012 that was filed with the NDIC. (Ex. P10). This lends some support to an argument that they were obligated at that time to provide the notice of transfer. However, this notice of transfer was later rejected by the NDIC as being defective in form. (Tr. Tr. 15-16). And, while the record is murky, it appears that substantial disputes had arisen between the parties by the time of its rejection that, along with other evidence described below, creates some doubt as to whether the Azars were in breach of any obligation to provide the notice of transfer prior to Leland Oil later making the one and only payment on the note months later in November 2013.

Soon after the assignment, a dispute arose over whether Bensun Energy and Leland Oil had fully complied with their obligation to complete certain work required to get the McMahen State operating using K&R Roustabout. Leland Oil and Bensun Energy claimed that they had fully performed their obligation in August 2012. (Ex. P4). This was disputed by the Azars. Where the truth lies is difficult to determine, but there is evidence that the well broke down in September 2012 and that K&R Roustabout continued to do work on the well to fix the problems. (Exs. P7, P11, P20). There is also evidence that the well broke down again in December and that K&R Roustabout refused to perform any more work on the well because it had not yet been paid by the Azars for the work it had performed to date. (Ex. P4). It is unclear based on the record what obligations Leland

Oil and Bensun Energy may have with respect to these breakdowns, if any, given the uncertainties with respect to the contractual obligations as well as the cause of the breakdowns in terms of whether it related to work they performed through K&R Roustabout earlier or were otherwise obligated to perform.

While this was going on, Leland Oil and Bensun Energy never made any of the payments that had become due on the promissory note and were in default. Again, while the record is murky, there is some suggestion that the payments were not made because the Azars had not yet paid K&R Roustabout. Leland Oil also now claims that it did not pay on the note because the Azars had not yet provided the notice of transfer. The Azars appear to have taken the position that they were under no obligation to provide the notice of transfer so long as the promissory note was in default and Leland Oil and Bensun Energy had not fully complied with what they perceived to be the work required to be performed on the McMahen State. These disputes, which developed in the second half of 2012, spilled over into most of 2013. (Exs. P1, P4, P6, P12, P19, P20, P22, P23, P24) (Tr. Tr. 60-61). Given the uncertainty over what exactly the parties had initially agreed to as well as whether those obligations had been modified by the parties' subsequent performance or lack of it, it is difficult to determine whether the Azars were in actually in breach of any obligation to provide a notice of transfer up until Leland Oil made the one and only payment on the promissory note in November 2013.

15.     Leland Oil appears to contend that the Azars were in breach earlier because of two additional determinations that the court made pursuant to Leland Oil's earlier motion for summary judgement, those being:

> 2.     Neither Leland, K&R, nor Bensun, have any legal obligation under the Contract, as modified by the Parties, to secure or provide further services to fix, maintain or otherwise service the McMahen State 1 well; and

3.      Leland and Bensun have fully performed all of their obligations owed Azar under the Modified Contract.

(Doc. No. 44, Ex. P5). The problem with this, however, is that no determination was made as to when the referenced obligations were fulfilled.

16.      Particularly telling with respect to the uncertainty as to whether the Azars were obligated to provide the notice of transfer prior to the one and only payment being made on the promissory note is the following testimony given by Krueger at trial:

> Q. (THE COURT CONTINUING) To be able to both produce and sell oil from the two wells would have required the filing of the instrument that you say Mr. Azar refused to provide, correct?
>
> A. Correct.
>
> Q. And so I can keep my time frame straight, that once you acquired the interest, then that form would have had to have been filed?
>
> A. Yes, as soon as he should've -- as soon as he got the money, it should have been -- the transfer should have been started and sent in to the State.
>
> Q. And how long was the payment of the money after the -- after the contract became effective?
>
> A. I think there was a -- I don't remember for sure. Like I say, it's been, you know, four years ago, but there was a -- he was -- wanted us to take care of the McMahen, so there was some strings attached to it. And we did follow through on our end of the deal taking care of the McMahen well, got it producing. *And at that point I believe the check was cut, and then the transfer was supposed to be taken care of at that point*.

(Tr. Tr. p. 61) (italics added).  Of the same import is Krueger's cover letter to the Azars dated November 1, 2013, in which he forwarded the check in full payment of the purchase price for the wells.  (Ex. P12).

17.      Given the foregoing, the court finds and concludes the Azars were obligated to provide a notice of transfer within a reasonable time after Leland Oil made the one and only payment on the promissory note in November 2013.  If the Azars were obligated to provide the

notice of transfer before that time, Leland Oil has failed to prove it.[2]

18.     The $75,000 check in satisfaction of the promissory note was forwarded by Leland Oil to the Azars by mail under cover of a letter dated November 1, 2013, and was cashed on November 6, 2013. (Exs. P4, P12).   A reasonable time for the Azars to have completed and filed the notice of transfer thereafter would have been two weeks.

In terms of any claim for lost production, however, some allowance of time must be given for the NDIC to have reviewed and approved the transfer.  The record supports a conclusion that this could have taken up to three months.  (Tr. Tr. 12-15, 22)  Consequently, the court finds and concludes that any calculation of damages based on lost production for the failure to timely provide a notice of transfer that includes the time period prior to March 1, 2014 is unsupportable for these reasons.

**The completion and filing of a notice of transfer acceptable to Leland Oil**

19.     Following the court's entry of partial summary judgment concluding that the Azars were legally obligated to complete and file a notice of transfer and that Leland Oil and Bensun Energy had fulfilled their obligations to the Azars, the Azars completed a notice of transfer dated February 16, 2016, which was provided to counsel for Leland Oil and filed with the NDIC sometime in March 2016. As of the date of trial, the NDIC had not approved the transfer, but that approval was expected to be forthcoming shortly. Leland Oil agrees that the most recent notice of transfer was this

---

[2] In 2014, the Azars completed and filed a notice of transfer with the NDIC only to have their Chicago counsel withdraw it from the NDIC's consideration.  (Tr. Tr. 18-19).  While the record is murky, it appears the Azars wanted Leland Oil or one of its affiliated companies to pump the McMahen State, which Leland Oil was refusing to do.  (Tr. Tr. 19-20, 38).  And, while the agreement amongst the parties called for Leland Oil and Bensun Energy to complete work on the McMahen State to get it into producing status, there is no evidence of any agreement that they had to operate the well thereafter.  With respect to determining when the breach of contract that the court determined in its entry of partial summary judgment occurred, the Azars failed to offer any evidence that would support a conclusion that, upon receiving full payment for the Davis State and the Sullivan wells, in November 2013, they were still excused from having to complete and file a notice of transfer.

9

time in proper form.  (Ex. 15; Tr. Tr. 12-15, 22-23).

The Azars have not disputed that Leland Oil was prohibited from commercially producing the Davis State  and the Sullivan because the NDIC had not approved the transfer of the wells.   In their posttrial briefing, the Azars contend that Leland Oil could have produced the oil and then marketed it through them.  However, the Azars have not offered any evidence that they were willing to do so at the time.   In fact, the evidence that the Azars were holding the completion of the administrative transfer hostage for other considerations after having received full payment suggests otherwise.  Further, it is not clear this would have been permitted.

**Damages for lost production from the Davis State well**

*The Davis State well*

20.     The Davis State is a vertical well located in Dunn County, North Dakota on school land owned by the State.  As a result of lack of production and other problems with respect to the Davis State and other wells, the State of North Dakota sued the Azars.  The settlement resulted in part on the Azars keeping the Davis State but limited to the right of producing only from the Madison formation[3] and with the State agreeing to waive its right to payment of royalty from that production.  (Tr. Tr. 94, 104-07).

According to the well history obtained from the NDIC, the Davis State first produced from the Madison in May 2001.  (Ex. P2).  Prior to the sale of the well to Leland Oil and Bensun Energy, the well had been operated only intermittently (about a third of the time according to the court's calculation) up until the last production in July 2009 before the sale by the.  One of the issues with

---

[3]  At various points in the trial, the Madison formation was also referred to as the Mission Canyon formation. For purposes of this case, these are the same formations.  (Tr. Tr. 25).  The court will use  Madison formation since that is what the NDIC refers to it in its production reports.  (Ex. P2).

the well is that it produces a significant amount of saltwater, which drives up its operating costs. (Tr. 41-42, 106; Ex. P2). During the period the Davis State produced from the Madison formation from May 2001 through July 2009, it produced 8,201 barrels of oil and 24,916 barrels of saltwater, which works out to approximately three barrels of saltwater for each barrel of oil.

Sometime after Leland Oil and Bensun Energy purchased the Davis State, Leland Oil completed an "acid job" as well as unspecified "downhole" work on the well. Following that, the well has been operated periodically but limited to two days at a time because of limited onsite storage and the inability to market the oil because of the lack of administrative approval for the transfer of ownership. When it has been operated, the well has produced approximately 40 barrels of oil per day. (Exs. P1, P2; Tr. Tr. 20, 38-39, 65).

### *Leland Oil's damage calculation*

21. Leland Oil began its damage calculation for the claimed lost production from the Davis State by first calculating what it claimed to be the historical average daily production for the well. The number that Leland Oil arrived at was 10.09 barrels per day. (Exs. P2, P3). From that, Leland Oil then assumed the historical average daily production would have increased by 40% to 14.12 barrels with the work it has done on the well. (Exs. P2, P3).

The next step of Leland Oil's damage calculation was to arrive at a figure for what it termed as lost net revenue. In making this calculation, it was assumed the well could have been produced *every* day from May 1, 2012 through September 2015 at the increased rate of production of 14.12 barrels per day.[4] Then, using the monthly averages of oil prices during the time frame under consideration and after deductions of amounts for 11.5 % state severance taxes and for estimated

---

[4] Krueger's expert report states 14.13 barrels per day, but the damage calculation performed by Leland Oil's expert uses 14.12 barrels per day.

operating costs of 20% gross revenue net of taxes, an amount of lost net revenue of $1,054,022 was arrived at. (Ex. P3).

Then to avoid the argument that allowing recovery for that amount might lead to a double recovery[5] since the oil that was not produced during the period for which the damage calculation was made remains in the ground and subject to future production, Leland Oil went through the same calculations but, instead of using the then monthly average oil prices for the period under consideration, it used the price of oil at the time of trial of $43.45 and arrived at a net revenue number of $540,875 for oil produced at that price. (Ex. 30; Tr. Tr. 87-89). Leland Oil then subtracted that figure from the lost net revenue number of $1,054,022 to arrive at a figure that attempted to measure the loss of being able to produce the well during the period for which damages were calculated, which was one of high oil prices. The net figure that Leland Oil arrived at was $513,147. (Ex. P32). Leland Oil contended that this was a rough measure of what was lost by not being able to produce the oil during the period of high oil prices that prevailed during most of the time that the Azars had failed to complete and file the required notice of transfer. While perhaps not articulated in exactly this way, Leland Oil's justification for using the $43.45 price appear to be that, while oil prices thereafter could go up or down, both parties bear that risk.

---

[5] In struggling to come up with a fair measure of damages in cases of delayed production of oil and gas, some courts have expressed concern that allowing recovery of lost profits may result in a double recovery as the oil and gas reserves are produced later. For that reason, courts in some cases have looked for other ways to measure the loss. See, e.g., Nerco Oil & Gas, Inc. v. Otto Candies, Inc., 64 F.3d 667, 668-70 (5th Cir. 1996) (comparing the discounted stream of net revenue that would have been earned over the life of production assuming no delay to a discounted stream of net revenue with the delay); In the Matter of TT Boat Corporation, Civ.A. -98-0494, 199 WL 1276837, at **2-7 (E.D. La. 1999) (same); Mobil Exploration & Producing v. A-Z/Grant International Co., Civ. A. Nos. 91-3124, 91-5056, 1996 WL 194931, at *6 (E.D. La. 1996) (suggesting that a fair return on investment may be an appropriate measure); cf. Short v. Wise, 718 P.2d 604, 607-08 (Kan. 1986) (allowing recovery of lost revenue directly attributable to the change in price during a period of declining oil prices); see generally J. Cooper & J. Lam, Recovery of Economic Damages for Delayed Offshore Production, 28 J. Mar. L. & Com. 323 (April 1997). In some cases, damages based on lost profits has been permitted when no other measure of damages has been presented and there is sufficient certainty for such an award. See, e.g., Continental Oil Co. v. SS Electra, 431 F.2d 391, 392-93 (5th Cir. 1970); In the Matter of Ensco Offshore Co., 990 F. Supp. 2d 751 (S.D. Tex. 2014).

During the trial, Leland Oil's accounting expert noted that this damage calculation did not include any consideration of the $200,000 in rehabilitation costs that Krueger testified were incurred for the Davis State well for the acid job and the downhole work. He suggested that approximately one-half of those costs should be deducted as representing the amount attributable to the period for which the damage calculation was made using a 7-year amortization. (Tr. Tr. 89-90).[6]

### *Problems with Leland Oil's damage calculation for the Davis State*

- #### **The time period considered**

22.     There are a number of problems with Leland Oil's damage calculation. One is the the period for which damages are being claim. For the reasons expressed earlier, Leland Oil has failed to demonstrate that the Azars were in breach prior to November 2013 for the failure to timely provide a notice of transfer. Further, as the court noted, there is also the time that the NDIC would have taken to approve the transfer. It was for these reasons the court found that there could be no claim for lost production prior to March 1, 2014.[7]

---

[6] What is somewhat curious is how this came about. There was no mention in the expert reports prepared by Krueger and his accountant of the $200,000 that had been spent on the well in attempting to rehabilitate it. The $200,000 was first mentioned when, after the initial direct and cross-examination of Kruegr, the court inquired about what had been spent on the Davis State after the purchase. It was following this testimony that the accounting expert testified that an amortized portion of the $200,000 should be deducted from Leland Oil's claimed damages for the Davis State.

[7] Even if the court is wrong with respect to March 1, 2014 being the starting date for any claim of lost production, there is another timing problem. Leland Oil assumes the Davis State was capable of producing not only every day during the period of May 2012 through September 2015 but also at a level which assumes that the required rehabilitative work on the well had been performed. According to Krueger, Leland Oil performed both an acid flush and certain unspecified downhole work on the Davis State but the evidence does not reveal with any specificity as to when the work was actually performed. In his expert report, which was received into evidence without objection, Krueger stated only that the acid job was performed after the well was acquired. Somewhat curiously, however, no mention was made of the downhole work that appears to have cost substantially more. (Ex P2; Tr. Tr. 65). During his trial testimony, Krueger stated that the acid job and downhole work were completed soon after "payment" was made for the well, but it is not clear whether that meant soon after the promissory note was given or after Leland Oil made the one and only cash payment on the well in November 2013. (Tr. Tr. 38, 65). But, even if it was the former, the lack of any information as to when the work was actually completed renders the first few months of Leland Oil's damage calculation for the Davis State unsupportable for this reason as well.

While the court concludes there is an insufficient basis for Leland Oil being able to claim damages for lost income for the period of May 2012 through February 2013, Leland Oil's damage calculation only goes through September 2015 and the notice of transfer that recently was provided had not been approved by the NDIC as of the date of trial on May 17, 2016. Any shift of the period for which damages might be claimed, however, means that more of the time for consideration of damages is during the period after the collapse in oil prices that occurred at the very end of 2014. The record reflects that the average price of oil during September 2015 (which was the last month for which Leland Oil calculated damages) was $45.46 per barrel and that, on May 9, 2016 (just days before the trial), the price was $43.45 dollars per barrel. These amounts reflect the significant downturn in the price of oil of $90 to $106 per barrel that was prevalent from when Leland Oil and Bensun Energy purchased the wells or even the $75 per barrel price as late as November 2014. Further, it appears the price dropped even lower than $43 to $45 per barrel between September 2015 and the date of trial in that Krueger testified about the problems of $30 oil. (Tr. Tr. 80).

- **The assumed average daily production**

23.     Another problem for Leland Oil's calculation of lost revenue from the Davis State is the use of its calculated historical average daily production of 10.9 barrels per day that is the foundation for its damage calculation. As noted earlier, Krueger claims that, with the work done on the Davis State, Leland Oil would be able to improve upon the average daily production going forward by 40%. As a consequence, it has used 14.12 barrels per day as its predicted average daily production. Further, Leland Oil assumes it would have been able to produce oil at rate every day during the more than three year period for which it claims damages.

In coming up with the 10.9 barrels per day, Krueger simply took the total number of barrels

produced for the entire time the Davis State produced from the Madison formation, which was from May 1, 2001 through July 2009, and then divided that by the total number of days in which there had been production. (Exs. P2, P3). Krueger never explained, however, why this produces a number that is representative of what the Davis State historically produced on a daily basis when the well was pumped day-in-and-day-out on a sustained basis, which is critical here given Leland Oil's damage calculation assumes that the well would have produced every day at rate 40% greater than its average historical rate.

An examination of the historical data in Ex. P2 reveals that Davis State was operated slightly less than a third of the time from May 1, 2001 through July 2009, including many instances when the well was operated for only a few days at time. And, when this occurred, most of the time the result was a higher daily production than what was achieved when the well was pumped every day for sustained periods of time. The apparent explanation for theses spikes in the daily production following the many periods of idleness or days when the well had been produced for only a few days is a rebound effect created when the well sits idle. Krueger testified to this rebound effect. (Tr. Tr. 38-40). In fact, he stated that for a well producing from the Madison formation, "you have to pump the well for at least 30 days to get it leveled out to see what it's actually going to do[.]" (Tr. Tr. 56).

The result of simply taking all of the production from the Davis State and dividing it by the total number of days the well produced to come up with a historical average daily production under these circumstances quite clearly results in an "average" that is skewed by the many days of outsized daily production resulting from the rebound effect. Looking at the historical data in Ex. P2, the last time the Davis State was produced for consecutive months on a virtually daily basis comparable, but still not as consistently as what Leland Oil assumes for its damage calculation, was

from March 2005 through January 2006.  For this period of time, the following are the numbers of barrels of oil and water produced for the months under consideration along with what Leland Oil calculated as being an "average daily production" of oil for those months in Ex. P2:

| Dates | No. days production | BBL oil | BBL water | Daily average for the month |
|---|---|---|---|---|
| January 2006 | 31 | 134 | 525 | 4.32 |
| December 2005 | 31 | 120 | 566 | 3.87 |
| November 2005 | 30 | 140 | 603 | 4.67 |
| October 2005 | 23 | 120 | 558 | 5.22 |
| September 2005 | 30 | 134 | 699 | 4.47 |
| August 2005 | 31 | 137 | 265 | 4.42 |
| July 2005 | 26 | 113 | 340 | 4.35 |
| June  2005 | 20 | 169 | 724 | 8.45 |
| May 2005 | 21 | 185 | 571 | 8.81 |
| April 2005 | 30 | 174 | 700 | 5.80 |
| March 2005 | 25 | 188 | 734 | 7.52 |
| | 298 | 1614 | | |
| Daily average | | 5.41 | | |

(Ex. P2).  If for this period, you take the total number of barrels produced and divide that by the number of days of production, the daily average is only 5.41 barrels.  Further, even this average might be skewed by the production during the months of May and June when the well was operated only 2/3's of the time as well as by the production for the month of March since the production in that month followed the well being operated for only 12 days in February 2005.  If you throw out the production from these months, then the daily average when the well was operated at the levels that Leland Oil claims it would have operated in its damage calculation drops to 4.62 barrels.

Krueger also fails to explain why the very early years of the production from the Davis State should be included in an "average" that is used to predict what might be produced going forward. And here, an examination of Ex. P2 reveals that the daily production rates in 2001were never matched in later years. Including the production from the very early years of the Davis State appears to have also skewed the average of what the data suggests was the actual ability of the well to produce on a sustained basis in later years.

In short, the court finds that Leland Oil's average daily production number of 10.09 barrels, which it uses as springboard for an even higher daily rate, is simply not credible.

**•    The assumption that the well would operate 100% of the time**

24.    Even if one assumes that a more representative historical average daily production number for the Davis State is in the neighborhood of 5.5 barrels per day when the well is operated day in and day out, there seems to be little to support the assumption in Leland Oil's damage calculation that the well would have been operated every day during the more than three years considered by its calculation without some allowance for downtime. Previously, the well had produced only about a third of the time. And, while some of that may have been due to economics and some of it may be taken into account if one assumed a lower average daily production number, there still appears to be a need for some additional discount for downtime. The Sullivan well, which is discussed in more detail below, has a history of being operated on an almost daily basis for sustained periods of time. Yet, in looking at the data this well, there were short periods of time when it was not produced.

**•    The use of a percentage of revenue for operating costs**

25.    Still another problem with Leland Oil's damage calculation for the Davis State if one

assumes a much smaller average daily production number - particularly after the precipitous drop in the oil prices - is the validity of the assumption that the operating expenses can be estimated at 20% of revenue after payment of taxes.

Instead of detailing what its monthly operating costs would be as part of its damage calculation, Leland Oil estimated that the operating expense for the Sullivan well would be 10% of gross revenue after adjustment for royalty and severance taxes and 20% for the Davis State after adjustment for severance taxes only since no royalty was owed on that production. Krueger testified that the reason for using the different percentages was that the Davis State would produce a greater amount of saltwater, which would significantly increase its operating costs on a recovered per barrel of oil basis. (Tr. Tr. 42-2; Ex. P2). A review of the historical production for the two wells indicates that the Sullivan well produces approximately ½ barrel of saltwater for every barrel of oil and the Davis State approximately 3 barrels. (Ex. P2).

While Leland Oil's use of a percentage of revenue after adjustment for royalty and taxes may be sufficient in providing a rough estimate of operating expenses at the production levels assumed by it - particularly when oil prices are high - it does not appear to work if one assumes a much smaller average daily production. For the month of April 2014 for the Davis State when the price of oil averaged $102.07 and Leland estimated its gross revenue would be $43,243.78 based on an average daily production of 14.12 barrels per day, the operating costs were assumed to be $7,654.15, which is 20% of the estimated gross revenue after first subtracting out 11.5% for taxes. For the month of June 2012 when the average price of oil was $82.30 per barrel, the estimate for operating costs was $6,171.61, approximately $1,5000 lower. (Ex. P3).

These amounts would more than sufficient to cover the costs of disposing of the saltwater

that Krueger estimated would be in the neighborhood of $2.50 per barrel. (Tr. Tr. 56). Using that per barrel amount, the monthly cost for disposing of the saltwater would be in the neighborhood of $3,177, assuming that three barrels of water was produced for every barrel of oil and Leland Oil's estimated production of 14.12 barrels per day of water for a 30-day month. The difference between that, which is fixed since the daily production of oil does not change in Leland Oil's damage calculation, and the amounts set forth above leaves roughly $3,000 to $4,500 to cover the other monthly expenses, some of which might vary with the amount of production and some not.

Likewise, for the Sullivan well, the use of 10% of gross revenue also leaves room for covering monthly operating expenses in addition to the costs of disposal of saltwater when the estimated daily production is at the level Leland Oil projected and oil prices are high. Using its formula for estimating operating expenses, Leland Oil calculated the operating expenses for the Sullivan well for the month of April 2014 to be $4,968.89 when the price of oil was $102.07 and that it was $4,006.46 for the month of June 2012 when the price of oil was $82.30. Assuming $2.50 per barrel as the cost of disposing of the saltwater and ½ barrel of water produced for every barrel of oil, the monthly cost of disposing of the saltwater at a production rate of 21.57 barrels of oil per day would be only $808.88 leaving roughly $3200 to $4,000 for other operating expenses.

The situation changes, however, if a significantly lower average daily production of oil is assumed. Focusing upon the Davis State well, the sufficiency of the 20% of revenue as an estimate for operating costs would be problematic if the rate of production is only 5 barrels of oil per day and the price of oil is $43.45 per barrel. When these figures are used, the gross revenue for thirty days of production would be $6,517 and 20% of that for operating expense, after first reducing for 11.5 % taxes, would be only $1,153.60. This would barely be enough to cover the $1,125 for the cost

19

of disposal of the saltwater, assuming three barrels are produced for every barrel of oil and a disposal cost of $2.50 per barrel of saltwater, let alone leave anything for other operating expenses. In other words, while the gross revenue of $6,517 after adjustment for taxes may be enough to cover the operating costs, the percentage of the operating costs would be greater than 20%, thereby reducing the net revenue and extending the time for recovery of the capital and lease acquisition costs. Other than the costs of saltwater disposal, Krueger never identified in his testimony what all of the operating costs would be. The only cost that he specifically mentioned, aside from the disposal of saltwater, was the monthly cost for the pumper, which he said averaged $1,200 per month for the wells operated by Leland Oil. (Tr. Tr. 57). Presumably, however, there would be other expenses, *e.g.,* electricity or diesel fuel to operate the pump, routine maintenance, and insurance.

- **The assumption that the rehabilitative work would better the average daily production on a sustained basis**

26. Still another issue for Leland Oil's damage calculation for the Davis State is the assumption that, with the rehabilitative work performed, it would be able to increase its average daily production over its historical average by 40% - particularly on a sustained basis. While the court has no doubt that work of this kind may increase production for some wells above the historical average for some amount of time, the court is not convinced from the evidence presented here that this would be true for most wells for the periods of time involved here, much less for the Davis State for which Krueger acknowledged the producing formation at the location of the well was thin and may be particularly tight. (Tr. Tr. 48- 49, 56). Krueger candidly acknowledged the following in response to cross examination:

- "The Davis State, like I said, it's yet to be determined what kind of well that

20

exactly is. We don't know yet." (Tr. Tr. 49).

- "[W]e don't know what this well [the Davis State] will do at the depletion rate or what the formation will give up because we've never been able to produce it long enough to ever -- to actually give it a good -- a good run." (Tr. 55).

- "All you can do is go off the historical from his [Azar's] production reports and from my acid job, you know, what -- we did enhance the production on it. But on a Mission Canyon you have to pump the well for at least 30 days to get it leveled out to see what it's actually going to do, to pump the water off and get it leveled out, in my experience." (Tr. 56).

### The court's analysis of potential damages

27.     Notwithstanding the problems with Leland Oil's damage calculation for the lost production from Davis State, (1) the Davis State has a record of historical production; (2) rehabilitative work was done on the well by an experienced and savvy operator with substantial experience in operating and rehabilitating wells; and (3), unlike the situation with respect to the Sullivan Well as discussed later, there has been some production from the Davis State, albeit limited, since the rehabilitative work has been completed and the intermittent instances of short term production following the completion has been good. Given this, the court concludes that the Davis State was capable of producing and generating revenue when the Azars first became liable for the failure to complete and file a notice of transfer. Further, based on the evaluation of the record evidence set forth below, the court concludes that the Davis State would have generated positive cash flow net of production expenses and taxes during the period when the Azars unjustifiably failed to complete and file a notice of transfer for the Davis State and Sullivan wells and during which high oil prices prevailed for much of that time. And, while the oil that Leland Oil acquired the right to produce remains in the ground and subject to future production, the investments that Leland Oil made and were not immediately able to obtain a return on resulted in a loss.

28.     In evaluating what might be the loss suffered by Leland Oil, one of the things that the court has done is to consider what the outcome would be of using Leland Oil's method of analysis but changing some of the inputs to address the problems set forth above as well as varying the time periods over which the calculations are made.  Instead of Leland Oil's historical daily production of 10.09 barrels per day, the court started with 5.5 barrels per day as being more representative of the well's historical production when produced on a sustained basis.  The court then assumed some downtime (roughly 10%) and reduced that number by a half barrel per day to 5 barrels per day.  From that, the court did not increase the daily production number for the rehabilitative work performed, concluding that, while any potential enhancement over a significant period of sustained production was too speculative, the rehabilitative work would allow the well to produce at the 5 barrel per day rate for some sustained period of time that included an allowance for downtime.  Another change that the court made was to the time frame over which lost revenue was calculated.  For the reasons stated above, the court ran one of its calculations from March 2014 through September 2015 instead of the May 2013 through September 2015 used by Leland Oil's calculation.  Further, because of the significant reduction in assumed daily production and the problem with using 20% of gross revenue after adjustment for taxes to calculate the operating expenses at low production levels, the court assumed a flat $4,000 per month for operating expenses based on the earlier discussion. With these adjustments, the net revenue generated for the period under consideration, *i.e.*, the revenue after taxes and operating expenses, would have been $110,219.13.

As noted earlier, Leland Oil in its damage analysis made an adjustment to address the

argument that any delay in providing a notice of transfer simply shifted the time when the revenue would be generated. To avoid an argument of potential double recovery, Leland Oil used the same assumptions for the period under consideration but substituted for the actual monthly prices of oil the price of oil a few days prior to trial of $43.45. Leland Oil then subtracted the net revenue generated using this oil price from the net revenue generated from the use of the actual and much higher oil prices during the period for which damages were calculated. Using the same $43.45 price of oil but with the court's other adjustments and assumed amounts, the net revenue figure works out to be $35,322.16. If this number is then subtracted from the net revenue amount of $110,219.13 using actual oil prices as set forth above, the difference is $74,896.97.

At trial, Leland Oil did not update its damage calculation to include the time period from October 2015 through at least April 2016. The reason why may be because it would not make a significant difference in their net number with oil prices hovering around or dipping below the $43.45 per barrel used in Leland Oil's offset calculation during those months. In fact, if the average of the price of the oil during those months was below $43.45, Leland Oil's damage amount would have been slightly less. Using the same assumptions as set forth above of production at 5 barrels per day and assuming that the average price of oil for the additional months of October 2015 and April 2016 was $38 per barrel, the addition of the extra months raises the net revenue from $110,219.13 to $117866.94. However, because of the additional months at lower oil prices as part of the offset calculation, the amount to be deducted would increase from $35,322.16 to $48,257.61. resulting in a drop of the adjusted net number from $74,896.97 to $69,609.32.

As already noted, while Leland Oil's damage analysis took into account taxes and operating expenses, it did not take into account the $200,000 spent in rehabilitating the Davis State. Leland

Oil's accounting expert testified that these costs normally are amortized over a 7-year period based on IRS requirements. Given the 3½ years covered by Leland Oil's calculation, Leland Oil's expert suggested that this would be approximately $100,000. If the court was to make a similar offset for the 19 months covered by its hypothetical calculation of loss through September 2015, the amount that would then be deducted is $45,238.10 based on a 7-year (84 months) amortization. When this is subtracted from the amount of the loss adjusted for double recovery of $74,896.97 through September 2015 , the result is a net amount of $29,658.87. Further, if the additional months through April 2016 are considered, the amortized amount for the now 26 months to be deducted would be $61,904.76 and if that amount is subtracted from the net of $69,609.32 (assuming $38 price per barrel of oil for the additional months), the amount falls to $7,704.56..

What the latter in part reflects, if production from the Davis State was to average only 5 barrels per and a minimum of $4,000 operating costs, is that, even though the gross revenue is sufficient to cover the taxes and operating costs even at $38 per barrel oil, the amount left over is not sufficient to fully cover the monthly amount for amortization of the $200,000 over a 7-year period of $2,380.95. In fact, for a 30-day month, the amount left over to cover the monthly amortized amount would be only $1,044.50 at $38 per barrel oil. In other words, while there is some money left over to chip away at the $200,000, the time required to recover that amount is substantially lengthened.

During his testimony, Krueger acknowledged the difficulty of recovering substantial capital expenditures over a reasonable period of time at low oil prices. In response to the assumption of having to incur substantial capital expenses for the Sullivan well, he responded by stating:

A. Well, the payout is going to be awful slow. I mean, your payback now at this point at $30 a barrel, by the time you figure your discount, you know, I mean, it's -- you're looking -- it's going to pay for itself, but it's going to be a long time. It's going to take a while, you

know. You know, it's kind of like betting on horses. You know, you just kind of -- you
know, it just takes a while to get paid back sometimes, especially in this environment where
the oil prices are now versus where they were, you know, four years ago, so --

(Tr. Tr. 80).

27.     While the court believes that its computation of damages using Leland Oil's
methodology but changing some of the assumptions reaches a result that is less speculative than
Leland Oil's, the court does not believe that it is an accurate reflection of the loss actually suffered
by Leland Oil either.  That is, while Leland Oil's methodology may work in roughly estimating the
damage for loss of production for a commodity with less price volatility, the court is not certain it
works here, particularly when the lost production was during a period of sustained high prices
followed by a price collapse.

From Leland Oil's perspective, the first thing that it would want to recover in operating the
Davis State would be to get back what it paid for the two wells plus its additional capital investment
of $200,000; after that, any future revenue net of taxes and operating expenses would be gravy.  As
set forth above, even when using the 5 barrel per day rate of production, the Davis State would have
generated $110,219.13 in revenue net of taxes and assumed operating expenses if the well operated
at the assumed level during the 19 months through September 2015 and $117,866.94 if it operated
at the same level for the full 26 months through April 2016.  This would have covered slightly more
than half of the $2000,000 that Leland Oil estimated it spent on the acid job and the other
unspecified downhole work.  Or, putting it another way, it would have recovered back the $75,000
Leland Oil  paid for the two wells plus some additional amount to cover a portion of the $200,000.
But, if the price of oil does not rebound to substantially higher levels than $43.45 going forward, the
ability of Leland Oil to recover back what it paid for the wells and the $200,000 in rehabilitation
expense over reasonable period of time is problematic.  Also, unlike cases where one single event

has caused the loss of production and applied a different analysis,[8] here the Azars failure to timely complete and file a notice of transfer was not a single one time event but rather continued over the period of time when oil prices were high and that would have allowed Leland Oil to have recover back a significant part of its investment within a reasonable time.

For these reasons, if Leland Oil had presented evidence from a petroleum engineer/geologist that would have given greater certainty to the likelihood of the Davis State being able to operate for 90% of the time or greater for the 19-26 months covered by the court's hypothetical calculations and being able to recover oil at the rate of 5 barrels per day or greater amount for the entire period, the court would have had a difficult decision to make in terms of whether it should simply award damages in the amount of the lost net revenue in the range of $110,219.13 to $117,866.94 and not made any other adjustments, so long as Leland Oil had not yet recovered back the $200,000 in rehabilitation costs as well as all or a portion of the $75,000 paid for the wells.[9]

29.     What arguably is less subject to speculation, however, given that the Davis State is an operating well with a proven ability to produce at least some oil, is the likelihood that it would have been able to earn during the period in question enough after taxes and operating expenses for Leland Oil to have recovered at least the $75,000 that it paid for the two wells given the high oil prices that prevailed for much of the period - an amount the court believes is an appropriate damage award for reasons expressed later.

---

[8]  See note 5 supra.

[9]  See Usher v. Gongre, 526 So.2d 1307, 1310-1311 (La. Ct. App. 3rd Cir. 1988) (in evaluating evidence of damages for lost revenue resulting from delayed production, the court rejected estimates of daily production of oil by an "expert operator" of 4.5 barrels per day for each of two wells as being too speculative but found convincing the estimate of one barrel per day for each of the wells made by a petroleum engineer and geologist and awarded an amount for lost net revenue based on those estimates).

**Recovery for lost production from the Sullivan well too speculative**

30.     The Sullivan is a vertical well located in Divide County, North Dakota. The well was first produced from the Madison formation in September 1981.  Except for a period from March 1991 to April, 1993 when the Sullivan was not produced at all, it produced fairly consistently through October 2005.  Thereafter, it operated more intermittently until the summer of 2006 when it was operated for only a few days and produced very little oil.  The last reported production was in August 2006, approximately six years prior to the purchase of the well by Leland Oil and Bensun Energy in July 2012.  (Ex. P2).   There are other wells in the area of the Sullivan producing from the same formation, some of which are still producing and some of which have been plugged.  (Tr. Tr. 46).  The total cumulative production from the Sullivan Well over its history from the Madison formation has been 88,537 barrels, approximately ten times the amount of production that has been obtained from the Davis State well.  (Ex. P2).  Since the Sullivan was acquired by Davis State and Bensun Energy, the well has not been produced and no work has been on the well.

31.     In some respects, the Sullivan might appear to be more promising than the Davis State.  Unlike the Davis State, it has not produced large volumes of saltwater relative to the amount of oil produced.  Also, it  has produced oil on a more consistent basis than the Davis State.  On the other hand, the fact that the well produced on a sustained basis for approximately 23 years along with other wells in close proximity producing from the same formation since the last production from the Sullivan raises a serious question as to how much more oil there is left to economically recover.  Krueger acknowledged this issue when he testified as follows:

Q. Are there other wells nearby pumping the same formation?

A. Yes, there's -- I believe there's three or four within the close vicinity, and there was several that have been plugged and abandoned through the years.

Q. Okay. But there are still wells that are still producing from that formation, is that correct?

A. Correct.

Q. And when you say "in the vicinity," are we talking within 10 a mile, or so?

A. Oh, I would say within a quarter mile, half mile.

Q. Is it your belief there is oil still remaining under the Sullivan well to be produced?

A. Yeah. Probably a lot less than there was, yes.

Q. And why do you say that?

A. Well, the existing wells, you know, that are neighboring it have been pumping since I bought it, and the reserves are dwindling, you know.

(Tr. Tr. 46). Without more evidence from a petroleum engineer/geologist, the court is reluctant to make any assumptions with regard to the Sullivan's ability to continue to produce for an extended period - particularly at the levels set forth in Leland Oil's damage calculation.

32. Another problem with the Sullivan is the evidence which indicates that there is likely something wrong it. This includes the erratic and declining production after October 2005 and the fact it has not been produced at all since August 2006. (Ex. P2). Krueger acknowledged during his testimony that there likely is a problem and that he would not know for sure what it is until he makes a thorough downhole investigation of the well, which he has not done and which he stated requires getting a rig in place to make the necessary inspection. (Tr. Tr. 81). While Krueger testified that he believes the problem most likely is a hole in the tubing (Tr. Tr. 52), he could not discount the possibility that the casing had collapsed and that the cost to fix the well could be substantial, suggesting at one point that this could cost $150,000 or more (Tr. Tr. 66) and at another point that it would "very expensive," suggesting the possibility it might be a quarter of a million dollars. (Tr. Tr. 51). When asked why Leland Oil had not proceeded with a downhole investigation and rehabilitation of the well, he stated he was not willing to make the financial commitment that would

be necessary to rehabilitate it without first having in hand a notice to proceed. (Tr. Tr. 66). Given this, a fair inference is that Leland Oil had serious reservations about the Sullivan. This is because it chose to spend the $200,000 in well rehabilitation on the Davis State and not the Sullivan despite the Davis State historically having been a poorer performer.[10]

Given the fact that Leland Oil has never produced the Sullivan, much less investigated fully what is wrong with it, and its history of declining production, the court concludes that a recovery based on a claimed lost opportunity to produce it during the period for which the court would otherwise allow recovery of damages is simply too speculative.

33.     There are also problems with Leland Oil's damage calculation for claimed lost production from the Sullivan. One is the period of time covered by the calculation that has already been discussed with respect to the Davis State. Another is the historical average daily production number of 13.48 barrels per day that Leland Oil uses as the springboard for it use of a 21.57 per barrel daily rate, a 60% increase that it claims it would be able to achieve by performing a chemical flush on the well for a mere $6,000. (Ex. P2). This historical average production number was calculated in the same manner as the one for the Davis State and suffers from the same deficiencies in that it includes days of outsized production after the well has been idle that skews what appears to be a lower average when the well is produced daily for sustained periods of time. Further, there appears to be no support for including in the calculation of the average production in the early 1980's that is 2-5 times higher than what was achieved in more recent years, particularly given the concern

---

[10]     Krueger at one point claimed that by performing a chemical squeeze he not only could have gotten the well to produce but also at the enhanced rate of 60% above its historical production. He testified that the would have then used the money from this production to fix any structural problems (Tr. Tr. 73-74). If that truly had a fair probability of succeeding, why then did not Leland Oil perform the chemical squeeze that Krueger testified would have cost only $6,000 along with or before spending $200,000 on the Davis State? Krueger's testimony on this point is simply not credible.

about the length of time the well and surrounding wells have been producing and the probable depletion of the formation.

Finally, while it may be that a chemical squeeze may enhance production on certain wells, whether it would so on this well and, more importantly, for how long is far too speculative to support an award of damages for any recovery over a more recent historical average.

**A damage award based on the purchase price for the two wells plus interest**

34.     When the Azars offered the Davis State and the Sullivan for sale, they were marginal and problematic wells. If at that time the price of oil was what it was following the collapse of the oil prices at the very end of 2014, it is doubtful that Leland Oil and Bensun Energy would have purchased the wells, much less that Leland Oil would have invested another $200,000 in attempting to rehabilitate the Davis State.  This is because, as the evidence quite clearly indicates,  it would take too long to recover back the initial investment much less turn a profit.

Essentially what Leland Oil and Bensun Energy were buying when they paid a mere $75,000 for the two wells was simply a chance that they could successfully rehabilitate at least one of the wells to the point of being able to produce enough revenue net of their costs to earn some measure of profit -  a gamble that only made sense at oil prices at or within a reasonable range of the prices in effect when the purchase was made.  From that perspective, what the Azars did when they failed to provide a notice of transfer by mid-November 2013 while oil prices were still high and remained so for  a number of months thereafter was to deprive Leland Oil and Bensun Energy the benefit of what they had purchased given the collapse in oil prices and no assurance that prices will recover enough and soon enough to allow recovery of their investment within a reasonable amount of time, much less earn a profit.  For this reason, the court concludes that an appropriate damage amount,

even if it is an imprecise one, is the $75,000 that Leland Oil paid for the two wells plus interest from the date the Azars cashed the check on November 6, 2013, to the date of entry of judgment at the legal rate of 6% per annum. With interest of $14,905.47, the total damage amount is $89,905.48.

The Azars are in a poor position to argue that they should not have to pay at least this much. In contending that Leland Oil is entitled to no recovery, they have argued that the two wells are "dogs" that simply should be shut in, with the Davis States producing too much saltwater for the low volumes of oil that might be recovered and the Sullivan likely having major structural issues and the cost of correcting them not worth what reasonably might be recovered given that the well may be, or is close to being, tapped out by the prior production from it and other wells in the immediate area. Further, unlike other possible damage amounts, there is no speculation as to the $75,000. Finally, with respect to any argument that Leland Oil would then be getting a windfall, there remains the money that Leland Oil spent in rehabilitating the Davis State in reliance upon the Azars timely completing and filing a notice of transfer that Leland Oil may never recover if what the Azars have claimed about the two wells is true. On the other hand, if one or both of the wells turn out to be winners, then the amounts that the Azars should have paid for the loss of Leland Oil not being able to produce the wells during the time period under consideration would undoubtedly have been greater than $75,000.

### An alternative damage amount based on interest on Leland Oil's investment

32.     The court finds that Leland Oil's investment of $200,000 in the Davis State, while speculative, was not an unreasonable one when considering the high oil prices that prevailed at the time investment was made and the large upside potential versus the risk. The court further finds that an appropriate rate of return on the $275,000 that Leland Oil had invested during the period of delay

that the court has deemed compensable is *at least* 10% given the risks involved. For the 26 months

from March 1, 2014 to the date of the trial on May 16, 2016, this would amount to $60,876.71. This

would be the minimum damage amount the court would find based on the Azars having failed to

timely provide the required notice of transfer.[11]

## CONCLUSIONS OF LAW

1. The law governing the recovery of damages for breach of contract in North Dakota has

been summarized by the North Dakota Supreme Court in <u>Martin v. Trinity Hosp.</u>, 2008 ND 176, 755

N.W.2d 900 as follows:

> Under N.D.C.C. § 32–03–09, "[n]o damages can be recovered for a breach of contract if they
> are not clearly ascertainable in both their nature and origin."

> [¶ 30] Although damages must be "clearly ascertainable," this Court has noted that,
> where it is reasonably certain substantial damage has resulted, mere uncertainty as to the
> exact amount will not preclude recovery. <u>See</u> <u>Langer v. Bartholomay</u>, 2008 ND 40, ¶ 27, 745
> N.W.2d 649; <u>Farmers Ins. Exch. v. Schirado</u>, 2006 ND 141, ¶ 17, 717 N.W.2d 576;
> <u>Livinggood v. Balsdon</u>, 2006 ND 11, ¶ 8, 709 N.W.2d 723; <u>Keller v. Bolding</u>, 2004 ND 80,
> ¶ 21, 678 N.W.2d 578. In cases where no definite evidence of an exact amount of damage
> exists, we allow proof by the best evidence available:

>> "[W]here damage obviously has been suffered, but there is no definite evidence
>> available for an exact determination of the amount of damage resulting from a
>> breach of contract, the best evidence which the circumstances will permit is all the
>> law requires."

> <u>Langer</u>, at ¶ 27 (quoting <u>Livinggood</u>, at ¶ 8); <u>see also</u> <u>Schirado</u>, at ¶ 17; <u>Keller</u>, at ¶ 21; <u>North
> Am. Pump Corp. v. Clay Equip. Corp.</u>, 199 N.W.2d 888, 891 Syll. ¶ 6 (N.D.1972). This
> Court has therefore concluded that, in cases "where the amount of damages may be hard to
> prove, the amount of damages is to be left to the sound discretion of the finder of facts."
> <u>Keller</u>, at ¶ 21 (quoting <u>B.W.S. Invs. v. Mid–Am Rests., Inc.</u>, 459 N.W.2d 759, 764
> (N.D.1990)); <u>see also</u> <u>Langer</u>, at ¶ 27; <u>Schirado</u>, at ¶ 17.

> [¶ 31] Our prior cases allowing proof of damages by evidence which may be
> imprecise have noted that application of this "best evidence" rule is limited to cases where
> proof of the amount of damages will be difficult and "there is no definite evidence available

---

[11] <u>See, e.g.</u>, <u>Nerco Oil & Gas, Inc. v. Otto Candies, Inc.</u>, 74 F.3d 667, 669-670 (5th Cir. 1996) (noting that a fair return on investment during the period of lost production would be an appropriate measure of damages); <u>see</u> <u>also</u> note 5 <u>supra</u>.

for an exact determination of the amount of damage resulting from [the] breach of contract." Langer, at ¶ 27; Schirado, at ¶ 17; Livinggood, at ¶ 8; Keller, at ¶ 21. The import of the holding in those cases is that a plaintiff may offer inexact evidence on the amount of damages in a breach of contract action only if there is no definite evidence available for an exact determination of the damages resulting from the breach.

Id. at ¶¶ 29-31. When recovery is sought for lost profits, "[d]amages for lost profits are recoverable where they are reasonable and not speculative." Langer v. Bartholomay, 2008 ND 40, ¶ 27, 745 N.W.2d 649) (citing Leingang v. City of Mandan Weed Bd., 468 N.W.2d 397, 398 (N.D.1991)).

2.       Applying these principles, Leland Oil has proved with reasonable certainty the fact it has suffered substantial damage from the Azars' breach of contract as adjudged by the court in its order granting the partial motion for summary judgment. For the reasons expressed above, the court concludes Leland Oil is entitled to judgment in the amount of $75,000 together with interest at the from November 6, 2013, to the date of the entry of judgment. Under N.D.C.C. § 32-03-4, prejudgment interest on damages awarded for a breach of contract is at the legal rate of 6% per annum set forth in § 47-14-05 in the absence of the agreement having specified a different rate. Red River Wings, Inc. v. Hoot, 2008 ND 117, ¶ 59, 751 N.W.2d 206. In this case, the amount of interest is $14,905.47, which results in a total judgment amount of $89,905.48.[12]

3.       The court rejects Leland Oil's damage calculations for lost production from the Davis State and Sullivan wells for the reasons set forth in the Findings of Fact, including the lack of factual support, undue speculation, and otherwise being unreasonable given the circumstances.

4.       K&R Roustabout is entitled to judgment in the amount of $19,552.80 based on the

---

[12] If Leland Oil believes this award to be too miserly, there are several things that Leland Oil could have done differently to have avoided what it claims was a greater loss. First, it could have elected not to close on the purchase of the two wells until it had in hand a properly completed notice of transfer. Second, it could have structured its contractual arrangements more clearly and avoided the more than a year hiatus in which its right to insist upon the completion and filing of a notice of transfer was in doubt. Third, it could have sought relief sooner rather than waiting until the middle of December 2014, which was almost a year and half after it claimed it was first entitled to receive a notice of transfer, to sue for injunctive relief.

stipulation of the parties.

## ORDER FOR JUDGMENT

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** and

**ADJUDGED** as follows:

1. Leland Oil & Gas, LLC shall have judgment against Marsha Azar and Saul Azar joint and severally in the amount of $89,905.48.

2. K and R Roustabout, Inc. shall have judgment against Saul Azar joint and severally in the amount of $19,552.80.

**JUDGMENT SHALL BE ENTERED ACCORDINGLY.**

Dated this 27th day of February, 2017.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court