**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Leland Oil & Gas, LLC, and K and R | ) | |
| Roustabout, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER DENYING RULE 60(b)(6)** |
| | ) | **MOTION TO SET ASIDE THE** |
| vs. | ) | **JUDGMENT** |
| | ) | |
| Marsha Azar and Saul Azar dba Illinois | ) | |
| Energy, and Bensun Energy, LLC, | ) | |
| | ) | Case No. 1:14-cv-161 |
| Defendants. | ) | |

## I.  INTRODUCTION

### A.    Procedural history

This case commenced in December 2014, with the filing of a complaint by plaintiffs Leland

Oil & Gas, LLC ("Leland Oil") and K and R Roustabout, Inc. ("K and R Roustabout").  Defendant

Bensun Energy, LLC ("Bensun Energy") never appeared and eventually a default judgment was

entered against it.  (Doc. Nos. 44-46).  Defendant Saul Azar made two requests for additional time

to respond to the complaint following service.  The court granted these requests but indicated that

any further request would likely be denied. (Doc. Nos.  16-18).  Finally, on April 13, 2015, an

answer was filed on behalf of both Saul and Marsha Azar (collectively the "Azars").  (Doc. No. 19).

After the parties submitted their proposed litigation plan,[1] the court issued its progression

order dated June 11, 2015, in which it set forth milestones for completion of discovery, disclosure

of experts and their reports, and deadlines for filing pretrial motions as requested by the parties in

---

[1] In their proposed plan, the parties consented to the undersigned's handling of the case for all purposes.  (Doc.
No. 23).

1

their proposed scheduling plan.  On the same date, the court set the trial for May 17, 2016.

On October 23, 2015, the plaintiffs filed a motion for partial summary against Marsha and Saul Azar, dba Illinois Energy, that was limited to addressing issues of liability.  (Doc. No. 35).  The motion was supported by affidavit testimony and other evidence establishing a basis for why the plaintiffs were entitled to the partial summary judgment they requested.  (Doc. No. 36). When, after approximately three months, there was no response by the Azars, the court entered an order granting the partial summary judgment on January 22, 2016.  In its order, the court referenced the court's local rule governing dispositive motions which provides that failure to respond may deemed an admission that the motion is well-taken and subject to a summary ruling.  (Doc. No. 44).  <u>See</u> D.N.D. Civ. L. R. 7.1(F).

 On May 13, 2017, the Friday before the trial that was set to commence on Tuesday May 17, 2016,  the Azars' attorney filed a motion to withdraw indicating that he had been discharged by the Azars the day prior.  (Doc. No. 50).  The motion was supported by affidavits executed by both Saul and Marsha Azar in which they agreed to the withdrawal and acknowledged being aware of the trial date.

The court held a hearing on the motion to withdraw on Monday, May 16, 2017.  The plaintiffs appeared with their counsel and Saul Azar appeared with the Azars' counsel.  Marsha Azar did not appear even though she acknowledged in her earlier affidavit she was aware of the trial date. (Doc. Nos. 47 & 65).

During the hearing and in a letter that the court received as an exhibit, Saul Azar contended he had not been informed of the trial date until May 10, 2016, and that he had not been aware of it previously.  He also indicated he needed more time to obtain an expert to defendant against the

claim for lost profits being made by Leland Oil.

The court then inquired of Azars' counsel whether he had provided his clients with notice of the trial date and counsel stated he had some time ago, both in writing and by phone call, and then again more recently. (Id.). The court also inquired of the plaintiffs what their position was with respect to the request for a continuance. Plaintiffs objected, stating that they had already traveled some distance for the trial and had arranged for their expert to be present the next day. They also added that the Azars throughout the case had been basically "no shows" in that they had not responded to the motion for partial summary judgment, they had not responded to the plaintiffs' discovery requests, and Saul Azar had failed to show up for his deposition. (Id.).

After considering what was presented at the hearing and not believing Saul Azar's contention that he never had been advised of the trial date until May 10, 2016, the court refused to continue the trial and gave the Azars a choice: either proceed *pro se* or proceed with their chosen counsel. (Id.). The next day, May 17, 2016, Saul Azar attended the trial, electing at that point to proceed with his attorney. (Doc. Nos. 53 & 66). Marsha Azar was again a "no show."

Shortly after the trial, the Azars retained new counsel who formally made their appearance on July 1, 2016. On the same date, they also filed a "Motion to File Posttrial Evidence" without, however, indicating what evidence they wanted to present. Also, notable with respect to what follows: (1) transcripts of both the trial and the hearing in which the court denied the request to continue were filed on July 19, 2016. (Doc. Nos. 65-66); (2) the Azars' new counsel were the ones who filed the Azars' proposed findings and conclusions as well as both an opening posttrial brief and a reply brief (Doc. Nos. 67, 68, & 72); and (3) no further request was made by Azars' new counsel during the next seven months before the court reached its decision to reopen the record

based on the reasons set forth in the present motion, including that the court should (a) consider additional evidence based upon the original counsel's gross neglect and backed by a proffer of evidence or (b) consider additional evidence backed by an offer of proof or to reconsider the court's earlier grant of partial summary judgement on the grounds that the court had procedurally erred in granting it.

On February 27, 2017, the court made its findings of fact and conclusions of law. On the same date, the court entered a final judgment in favor of the plaintiffs and against defendants Marsha and Saul Azar. (Doc. Nos. 75-76).

Thereafter, no direct appeal was taken. Further, despite having all of the information available to them necessary to make the present motion within a month or so of the trial, Azars' new counsel did not file the present motion until June 14, 2017, which was another 4½ months. (Doc. No. 80).

### B.    Other background

The court entered judgment in this case on two separate, but related, claims. The first was a claim by Leland Oil that the Azars had breached an agreement pursuant to which the Azars had sold Leland Oil and Bensun Energy, LLC ("Bensun Energy") two oil and gas wells - the Davis State and the Sullivan. More specifically, the claim was that the Azars breached the sales agreement by failing to timely file with the North Dakota Industrial Commission ("NDIC") a properly completed Notice of Transfer of Oil and Gas Wells—Form 15 ("Notice of Transfer") that would allow the purchasers to operate the two wells and realize upon the benefit of what they had purchased. As detailed in the court's findings and conclusions and as discussed further below, the sales agreement was consummated in June 2012, and an acceptable Notice of Transfer was not filed by the Azars

until February 2016 - shortly after the court granted partial summary judgment in which it held that the Azars were in breach for not having completed and filed the required Notice of Transfer. With respect to this claim, the court awarded damages in the amount of $89,905.48 - far less than approximately $1.2 million that Leland Oil requested at the conclusion of the trial.

The second claim in the case had to do with an obligation undertaken as part of the agreement for the purchase of the Davis State and Sullivan wells by Leland Oil and Bensun Energy, which was that they had agreed to do rehabilitative work, at the Azars' expense, on another well owned by the Azars - the McMahen State. To fulfill that obligation, Leland Oil had K and R Roustabout, an affiliated company, do the work, but the Azars failed to pay for it. At the commencement of the trial, K and R Roustabout and the Azars stipulated to the entry of judgment on that claim in favor of K and R Roustabout in the amount of $19,552.80. (Doc. No. 66, pp. 5-6). In fact, Saul Azar presented a confession of judgement that he had signed for that amount. (Id.; Ex. D2).

Other relevant background is set forth in the court's findings, conclusions, and order for judgment. (Doc. No. 75); Leland Oil & Gas, LLC, v. Marsha Azar and Saul Azar dba Illinois Energy, Case No. 1:14–cv–161, 2017 WL 752142 (D.N.D. Feb. 2, 2017) ("Leland Oil").

## II.   LAW GOVERNING RULE 60(b)(6) MOTIONS

Fed. R. Civ. P. 60(b) provides an opportunity for a disappointed litigant to seek relief from a final order or judgment by invoking one of six enumerated grounds. Here, the Azars rely upon the sixth "catch all" ground, which, in pertinent part, provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any other reason that justifies relief.

To prevail on a Rule 60(b)(6) motion, a movant is required to demonstrate the existence of

"extraordinary circumstances." <u>E.g.</u>, <u>Gonzalez v. Crosby</u>, 545 U.S. 524, 535 (2005); <u>Ackermann v. United States</u>, 340 U.S. 193, 199 (1950); <u>United States v Young</u>, 806 F.2d 805, 806 (8th Cir. 1986). The reason for this extremely high burden is to promote the finality of judgments. <u>Id.</u>; <u>see also</u> <u>City of Duluth v. Fond du Lac Band of Lake Superior Chippewa</u>, 702 F.3d 1147, 1155 (8th Cir. 2013) (Rule 60(b)(6) is an "extraordinary remedy for exceptional circumstances."). It is also in part for this reason that Rule 60(b)(6) cannot be used as a substitute for an appeal or the exercise of other available legal remedies. <u>E.g.</u>, <u>In re Zimmerman</u>, 869 F.2d 1126, 1128 (8th Cir. 1989) ("[Rule 60(b)(6)] is not a substitute for other legal remedies. Such relief is to be granted only when exceptional circumstances prevented the moving party from seeking redress through the usual channels."); <u>Young</u>, 806 F.2d at 806 ("Rule 60(b) is not available as a substitute for appeal.").

## III.  **DISCUSSION**

The Azars contend the court should set aside its judgment in this case for two reasons. First, they contend that their trial counsel was grossly negligent and abandoned them "pretrial." Second, they argue that the court procedurally erred when it granted partial summary judgment in favor of Leland Oil.

### A.  **Attorney gross negligence/abandonment**

#### 1.  *Introduction*

The Azars claim that their trial counsel's purported gross negligence and abandonment of them "pretrial" constitutes extraordinary circumstances thereby entitling them to relief pursuant to Rule 60(b)(6). The court disagrees for two reasons - either of which is sufficient to deny the motion. First, the court does not believe that the particular circumstances of this case arise to the level of extraordinary circumstances such as would justify relief pursuant to Rule 60(b)(6). Second, the

Azars have failed to demonstrate even a reasonable probability that the claimed deficiencies would likely have changed the result.

        **2.**      *The claims of attorney misconduct when considered against the Azars own responsibilities as litigants*

The Supreme Court has made clear that, generally speaking, civil litigants are accountable for the acts and omissions of their attorneys. See, e.g., Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 396-97 (1993) ("Pioneer Investment"); Link v. Wabash R. Co., 370 U.S. 626, 633 (1962) ("Link). In Link, the Court stated with respect to the dismissal of that action because of the failure of counsel to show up at a scheduled pretrial conference:

> There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. *Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent.* Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' Smith v. Ayer, 101 U.S. 320, 326, 25 L.Ed. 955.

370 U.S. at 633-34 (italics added). And, while Link was not a Rule 60(b) case, the Court did state:

> Nor need we consider whether the District Court would have been abusing its discretion had it rejected a motion under Rule 60(b) which was accompanied by a more adequate explanation for the absence of petitioner's counsel from the pretrial conference. No such motion was ever made, so that there is nothing in the record before us to indicate that counsel's failure to attend the pretrial conference was other than deliberate or the product of neglect.

Id. at 635-36.

Because a litigant is ultimately responsible for the acts or failures to act of chosen counsel, a number of courts, including the Eighth Circuit, have held that even gross negligence on the part of counsel is not enough - or at least not enough in most cases - to grant relief pursuant to Rule

60(b).  See, e.g. United States v. Parcel of Land with Building, Appurtenances and Improvements, Known as Woburn City Athletic Club, Inc., 928 F.2d 1, 6 (1st Cir. 1991)[2](citing Link and other authority for the proposition that only in rare cases will gross neglect be characterized as an extraordinary circumstance requiring relief under 60(b)); Reinsurance Co. of America, Inc. v. Administratia Asigurarilor de Stat, 902 F.2d 1275, 1278 (7th Cir 1990) ( stating that "this Court has never held that an attorney's gross negligence justifies relief under Rule-60(b)[,]" but noting the division of authority with respect to whether gross negligence may be sufficient in some cases); Heim v. CIR, 872 F.2d 245 (8th Cir. 1989) (counsel's failure to offer evidence in a tax case to rebut assertion of penalties or to notify clients of the tax court's decision and his stipulation to an erroneous appraisal of property, even if gross negligence, was not an adequate showing of exceptional circumstances); cf. Community Dental Services v. Tani, 282 F.3d 1164, 1168-69 & n.10 (9th Cir. 2002) (concluding that gross negligence can be enough to invoke relief under Rule 60(b)(6), at least in cases where judgment has been entered by default, but noting the more stringent position taken by the Seventh and Eighth Circuits that gross negligence is generally not enough).

But, even to the extent  gross negligence may be a consideration, a litigant's own acts and failures to act are grist-for-the-mill in determining whether, on balance, relief is equitably justified in a particular case.  See, e.g., Ben Sager Chemicals International, Inc. v. E. Targoz & Co., 560 F.2d 805, 810-11 (7th Cir. 1977) (court did not abuse its discretion in failing to grant Rule 60(b) relief, even assuming gross negligence of the attorney, because the of the failure of the client's affidavits to reflect he had made "frequent inquiry as to the status of the case" and because it was not enough

---

[2]  Overruled on other grounds by  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998).

for the client to have merely relied only upon assurances of his attorney "that the case was proceeding without problem"); United States v. Cirami, 535 F.2d 736, 739 (2d Cir. 1976) ("The affidavit of Salvatore Cirami [the client] is hardly illuminating. In addition to the vagueness already seen there is no indication that any efforts were made by Cirami or his wife to ascertain at the time the status of the matter or the activity, if any, of his then-counsel. Cirami is an experienced businessman and no stranger to the activities of the Internal Revenue Service.").

Further, while it may be one thing to grant relief for gross neglect on the part of an attorney when a default judgment has been entered early in the case, it is another matter when, as here, the case was pending for more than two years and had proceeded through trial. At that point, as illustrated by the foregoing authority, the interests of the plaintiffs in finality (including not having to expend additional resources to litigate the case all over) become greater and the Azars' justifiable excuses for not insuring that they were being properly kept up to date as to status of the case and being provided with copies of all relevant documents (and discharging counsel earlier if there was a failure) became fewer or nonexistent.

In an attempt to avoid the result of the application of this precedent, the Azars claim not only that their chosen counsel and agent in this litigation was grossly neglectful, but also that he abandoned them "pretrial." What they point to "pretrial" are: (1) the lack of a response to plaintiffs' motion for partial summary judgment as to liability; (2) allegations of not providing copies of relevant documents, including the answer and the court's ruling on the motion for partial summary judgment; (3) purportedly giving false assurances the case was being adequately handled; and (4) not communicating to them the date for the trial until just before trial. In addition, Marsha Azar claims she had virtually no communication with counsel and that he failed to defend her separate

interests by not objecting to the complaint on grounds of lack of personal service and submitting a joint answer on behalf of the Azars that admitted to the allegation in plaintiffs' complaint that the Azars were husband and wife, when the Azars claim they were not and were divorced.[3]

Some perspective with respect to these allegations is in order. Starting first with the lack of response to the motion for partial summary judgment, it would not be negligent (much less grossly negligent) to not respond to a motion for partial summary judgment with respect to liability if there was no real defense - particularly if marshaling limited litigation resources was a concern.[4] And, as explained later, the Azars have failed to demonstrate that there was any credible defense to liability.

Likewise, failing to raise the threshold defense of lack of proper service is not negligent if the calculation was that good service could eventually be accomplished and/or the litigant does want to be bothered by process servers. In fact, it is not uncommon for competent counsel to advise ignoring imperfections in service because raising threshold defenses like this often results in costly and merits-resolution-delaying "wheel-spinning."

These matters are obviously of more concern if the Azars' counsel acted without fully

---

[3] Interestingly enough, while Marsha Azar complains about the lack of evidence of what she agreed to with respect to the sales agreement and about the lack of contact with her in the handling of the lawsuit (even though she makes no reference in her affidavit of her ever taking the initiative to call counsel and even though she did not bother to show up for trial), Saul Azar contends with respect to the negotiation of the pumping agreement that, although it was purportedly for the benefit of what he termed as Marsha's Illinois Energy, LLC, that he was the person who conducted all of the negotiation with respect to that agreement. (Doc. No. 82, ¶¶ 6, 11).

[4] Saul Azar states in his affidavit that he and his wife secured the services of their attorney with a $7,500 retainer. The court has substantial doubts as to whether the Azars would have a funded what would have been required to make a "full court press" with respect to both liability and damages, particularly given the evidence of how they conducted their other affairs. The credible evidence in this case was not only did the Azars fail to pay K and R Roustabout for the rehabilitation work performed on the McMahen State well, the likely reason for why they insisted that Leland Oil and Bensun Energy have K & R Roustabout do that work in the first instance was because of the difficulty they were having in finding others to do it because of their reputation in the oil patch of not paying their bills. (Doc. No. 66, pp. 53-54). Also, the State of North Dakota had sued the Azars for $320,00 for breaches of obligations under their state leases. (Doc. No. 66, pp. 104-05).

consulting them. While there are reasons to doubt the Azars' self-serving affidavits that counsel had failed to communicate with them to the extent claimed,[5] even assuming the truth of most it, the point remains that they chose their counsel and it is clear enough from their affidavits, as well as what else went on, that they did not take sufficient steps to insure that they were being kept apprised as to the status of the case. While Saul Azar claims in his affidavit to have contacted his attorney twenty times, he also claims in his same affidavit testimony that he had only one contact with counsel during the extended period from when the motion for partial summary judgment was filed up until less than a week prior to trial. (Doc. No. 82, ¶¶'s 7-8). Also, Azar claims he was not provided with the motion for partial summary judgment or even the answer, admitting only with respect to the motion for partial summary judgment that his attorney told him "something" had been filed and that it was being taken care of. (Doc. No. 82, ¶¶ 5, 7-9). Finally, while Marsha Azar complains about

---

[5] For example, Saul Azar claims in paragraph 7 of his affidavit that he had contact with his trial counsel sometime after October 23, 2015 (which was the date that the motion for partial summary judgment was filed) and claims that his counsel told him only that something had been filed but he was taking care of it. Azar then claims in the next paragraph of his affidavit that he did not speak with his counsel again until approximately five days prior to the trial in August 2016, when he claims he was first advised he would have to show up for the trial, and that the had not been made aware of the motion for summary judgment specifically or the court's ruling. (Doc. No. 82, ¶¶'s 7-8). If Saul Azar had no contact with counsel for this extended time, it calls into question what he then claims in paragraph 10 of his affidavit:

> I attempted to remain diligent to check on the status of the above-captioned matter. I called Attorney Weiss approximately twenty times to get status updates from the time I retained him until four days before the May 16, 2016, hearing [*i.e.*, the hearing on the motion of attorney Weiss to withdraw that was held the day prior to trial].

(Doc. No. 82, ¶10). Also, the court entered its order granting partial summary judgment on January 22, 2016. In its order, the court concluded the Azars were in breach of the sales agreement for having failed to file a properly completed Notice of Transfer. Shortly, thereafter, on February 16, 2016, Saul Azar completed a Notice of Transfer that was filed with the NDIC. (Doc. No. 66, pp. 12-13; Ex. 15). The court doubts this was merely a coincidence and, if it was not, then one or both of the Azars would have been aware of the grant of the partial summary judgment. Also, the Azars make a big deal out of the fact that their attorney did not bring out the fact that they were no longer husband and wife, including erroneously agreeing that they were by admitting to it in the answer. While somewhat beside the point since their marital status did not affect what the court decided, Saul Azar referred to Marsha Azar as his wife in his affidavit in support of the present motion to set aside the judgment. (Doc. No. 82, ¶ 5). Further, Saul Azar's excuse for not attending his deposition (at the last minute and before plaintiff's counsel could be notified) was that he could not attend because Marsha Azar was having knee surgery. (Doc. No. 85-1, pp. 3-4). Finally, there are other inconsistencies between what Saul Azar claims in his present affidavit and what he testified to at trial as noted elsewhere. In summary, the Azars' self-serving affidavits are riddled with inconsistencies and strain credulity.

counsel's failure to confer with her, she fails to set forth in her affidavit any steps that *she* took to insure that her case was being adequately handled. (Doc. No. 83).

As noted earlier, other courts have concluded that a comparable lack of affirmative action by the client, including not making sufficient inquiries and relying upon vague assurances that things are being handled, forecloses any claim of extraordinary circumstances based upon deficient performance of counsel.

Finally, with respect to the allegations of abandonment, the Azars' counsel: (1) filed an answer on their behalf (Doc. No. 19); (2) participated in the development of a scheduling plan and the initial scheduling conference (Doc. Nos. 22-23); (3) showed up for Saul Azar's deposition on September 28, 2015, even when Azar had not (Doc. Nos. 85 & 85-1); (3) apparently consulted with the Azars about getting a box of documents to turn over in discovery (Doc. No. 85-1, p. 4); (4) prepared the necessary exhibit and witness lists prior to trial and participated in the final pretrial conference (Doc. No. 49); and (5) represented the Azars at trial (Doc. Nos. 53 & 66). During the trial, the Azars' counsel was familiar with the issues and had obviously prepared. He asked intelligent questions in cross-examination of plaintiff's witnesses and in the direct examination of Saul Azar as part of the defense. He also interposed objections. Further, the points that counsel made during cross-examination and direct examination went to the heart of the reasons why the court rejected what initially was Leland Oil's experts' seven figure damage calculation and, instead, awarded less than a hundred thousand dollars - omitting that part of the judgment that was stipulated to and which, when added on, resulted in a total judgment of just a little over a hundred thousand dollars. (Doc. No. 66).

This is not to say that the court necessarily believes that the Azars' counsel did everything

correctly or that his interaction with his clients was all that it should have been. The point here is that the Azars have failed to demonstrate that they are entitled to Rule 60(b)(6) relief vis-a-vis plaintiffs based on the claimed inadequate performance of counsel given the particular circumstances of this case, including the Azars' own responsibilities for keeping up to date with respect to its status and the performance of their chosen counsel.[6]

### 3. The Azars failure to demonstrate even a reasonable probability the result would have been different but for the purported gross negligence/abandonment by counsel

Central to their claim of attorney gross negligence and abandonment pretrial is the Azars' claim that the motion for partial summary judgment should have been opposed. What they have failed to offer in support of the extraordinary relief they are now seeking, however, is sufficient evidence (much less a plausible explanation) for why opposing the motion would have made a difference. This is true even if the court were only to apply a "reasonable probability" standard comparable to what is required under Strickland v. Washington's second prong for obtaining relief for ineffective assistance of counsel in criminal cases. See Community Dental Services, 282 F.3d at 1170-71 (noting the similarity of what would have to proved under Rule 60(b)(6) for relief for ineffective assistance to amount to "extraordinary circumstances" under the more lenient standard adopted by some Circuits (but apparently not the Eighth) and what is required to set aside a criminal judgment under Strickland). Under Strickland's second prong:

---

[6] If the Azars were truly aggrieved by the actions of their counsel and can prove that material damage proximately resulted as a consequence (which is doubtful), they have a different remedy as the Supreme Court explained in Link: "[I]f an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice." Link, 370 U.S. at 634 n.l0; see also United States v. 7108 West Grand Ave., Chicago, 15 F.3d 632, 633 (7th Cir.1994) ("Malpractice, gross or otherwise, may be a good reason to recover from the lawyer but does not justify prolonging litigation against the original adversary."). Marsha Azar may also have to look to Saul Azar.

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland v. Washington, 466 U.S. 668, 694 (1984).

As noted earlier, there were two matters in dispute in this case. One was the amount owed to K and R Roustabout, Inc. for rehabilitation work done on the Azars' McMahen State well. As noted earlier, the $19,522.80 portion of the judgment was stipulated to at trial by the Azars' counsel with Saul Azar present and backed by a signed confession of judgment by Saul Azar. There is simply no basis for granting relief from this portion of the judgment.

The second matter in dispute related to the sale of the Azars' interests in the Davis State and the Sullivan wells and their failure to file a properly completed Notice of Transfer with the NDIC so the purchasers could operate the wells. In support of their contention that they could have defended against this allegation of breach of the sales agreement, the Azars principally rely upon the court's determination that the ultimate terms of the sale of the Davis State and Sullivan were oral and a July 2014 pumping agreement that Illinois Energy, LLC entered into with Bensun Energy, LLC. The Azars contend that the July 2014 pumping agreement, which was not presented to the court, is evidence that Leland Oil and Bensun Energy's obligations under the sales agreement were broader than what the court concluded.

As detailed in the court's findings and conclusions, the ultimate agreement with respect to the sale of the Sullivan and Davis State wells was reached in June 2012 - some two years before the July 2014 pumping agreement- and was based upon two things. One was a written offer executed by the Azars, which the ultimate agreement in substantial part followed. The rest was based on subsequent modifications (most probably oral) to the terms set forth in the written offer as evidenced

by what the parties ultimately did to consummate the agreement. The court concluded the deal reached in June 2012 was that the Azars would convey their interests in the Davis State and Sullivan wells (including completing and filing the required NDIC Notice of Transfer) in exchange for (1) a $75,000 promissory note and (2) the promise of Leland Oil and Bensun Energy to perform certain rehabilitative work on the McMahen State well that would be paid for by the Azars. (Exs. P1, P4, P8, P9, P11; Doc. No. 66, pp. 28-34, 69-70). <u>Leland Oil</u>, 2017 WL 752142, at *3.

Notably, the obligation to complete the Notice of Transfer form was an express provision of the written offer signed by the Azars and the fact that it remained a part of the final agreement was confirmed by the Azars attempt to fulfill that provision within a couple of weeks after assigning their interests in the wells to Leland Oil and Bensun Energy by filing a form with the NDIC in July 2012, which was rejected by the NDIC as being defective. (Ex. P10). In fact, when asked about the filing of a Notice of Transfer at trial, Saul Azar tellingly testified in response to questions by the Azars' counsel:

> Q. And you did, in fact, sell the two wells, correct?
> A. Yes.
> Q. And you were paid $75,000 for that?
> A. Yes.
> Q. And just recently you have executed a well transfer, is that correct?
> A. Well, I executed well transfer several times, but I don't know why it did not work out. * * * *

(Doc. No. 66, pp. 103-04). In short, it is clear that the Azars were contractually required to file a properly completed Notice of Transfer.[7]

---

[7] A very plausible conclusion from what was presented to the court was that the Azars were in breach of the sales agreement in failing to file a Notice of Transfer within two weeks or so after they received the consideration for the two wells in the form of the promissory note. Evidence supporting such conclusion includes the fact the Azars did complete and file a Notice of Transfer in July 2012, a couple of weeks after the assignment of the two wells in exchange for the promissory note, that was rejected by the NDIC as being defective in form. (Ex. P10). Notwithstanding this, the court gave the Azars every benefit of the doubt (and, perhaps, erroneously so) by concluding that they were not in breach until a reasonable time after full payment was made on the $75,000 note in November 2013, more than a year later.

Likewise, the provision requiring the purchaser of the wells to perform work on the McMahen State - limited to the rehabilitation work required to get the well up and running as opposed to, as discussed in a moment, operating the well thereafter - was also an express provision of the written offer signed by the Azars, which, in relevant part, read as follows:

7.    A guarantee from Bensun Energy to Seller that services will commence to work on the McMahen State oil well at seller's expense within 20 days of closing date

8.    Estimated McMahen State well work over costs ($20K) will be held in escrow until well has been put back into production.  * * * *

(Ex. P 8).  After the consummation of the sales agreement in June 2012 and consistent with the purchasers having undertaken an obligation to perform rehabilitative work to get the McMahen State up and running, Leland Oil had K and R Roustabout (an affiliated company) performed the rehabilitative work.  This work was eventually completed, but never paid for by the Azars.  The amount that the Azars owed was the subject of the stipulated judgment in favor of  K and R Roustabout in the amount of $19,522.80.

The Azars appear now to contend that their continued failure to file a proper Notice of Transfer with the NDIC - even after full payment on the note was made to them in November 2013 - was somehow excused because of what they now claim was an agreement on the part of the

---

Further, the court very generously allotted more than three months for the NDIC to act on the Notice of Transfer before subjecting the Azars to damages in the form of interest, which the court did not begin calculating until March 1, 2013. Leland Oil, 2017 WL 752142, at **3-5.  If the judgment was reopened and a more developed record created, it might very well support a conclusion that the Azars' liability began in the fall of 2012, and not more than a year later, and that Leland Oil is entitled to greater damages either in the form of additional interest or, if another basis for calculation of damages is presented and found to be sufficiently not speculative upon a redo of the trial, much greater liability.

With respect to the latter, if the judgment was reopened and there is a new trial, the Azars are not guaranteed that the present judgment is the ceiling of their liability.  As the court noted in its earlier decision, there are a number of cases that have awarded damages for lost profits under somewhat comparable circumstances.  Leland Oil, 2017 WL 752142, at *6 n.5.  As second time around, Leland Oil might be able to present additional evidence that makes a calculation based upon lost profits less speculative and for both wells. If that happens and if the time period for the calculation of liability is extended back to the fall of 2012 when oil prices began to skyrocket, the result might very well be a damage award many times greater than the $89,905.48 the court awarded.

purchasers not only to perform the required rehabilitative work on the McMahen State well, but also to operate it. As evidence, they offer the July 2014 agreement between Bensun Energy and Illinois Energy, LLC for the pumping of the McMahen State and another well. (Doc. No. 83-1).

The problem with this is that the July 2014 pumping agreement was entered into more than two years after the agreement for the sale of the two wells was consummated in June 2012, not to mention some seven months after final payment was made on the note given for the two wells. Further, while the agreement reached in June 2012 was partially oral, there is no contemporaneous evidence that it included any obligation on part of either Leland Oil or Bensun Energy to act as the pumper of the McMahen State well. Rather, as already noted, the written offer signed by the Azars included only an obligation of the purchasers to cause certain rehabilitative work to be done on the well to get it up and running, which work was eventually performed. And now, other than pointing to the July 2014 pumping agreement and the court's determination that the June 2012 sales agreement was orally made in part, the Azars have offered nothing other than "arm waving" that there might have been something more.

For example, noticeably absent from the Azars' affidavits is detail with respect to any conversation in which the purchasers purportedly committed to being the pumper for the McMahen well in addition to performing the rehabilitative work on it, including identifying the parties to the conversation(s), when and where the conversation(s) purportedly took place, and what was purportedly said. [8] Further, and as noted earlier, after the court entered its order granted partial summary judgment which concluded that the Azars were contractually required to file a properly

---

[8] In fact, if this court was evaluating a complaint alleging a breach of an oral agreement, the Azars would not have satisfied even the Iqbal-Twombley standard for pleading given the lack of specificity. Cf. Ashcroft v. Iqbal, 556 U.S. 662, 677-80 (2009); Bell Atlantic v. Twombley, 550 U.S. 544, 554-55 (20017).

completed Notice of Transfer, Saul Azar completed a Notice of Transfer dated February 16, 2016, which was provided to Leland Oil and filed shortly thereafter. (Ex. P15; Doc. No. 66, pp. 12, 22-23). The Azars have offered no explanation for how this squares with the contentions they are now making.[9]

The Azars also throw out the possibility in their briefing that more effective representation would have limited any liability to that of Illinois Energy, LLC as opposed to the Azars personally. The evidence at trial vis-a-vis the purchasers, however, was:

- The written offer of sale signed by the Azars on May 22, 2012, reflects a proposed agreement by Marsha and Saul Azar d/b/a Illinois Energy to sell the Davis State and Sullivan Wells without mention of an entity that was a limited liability company. (Ex. P. 8).

- The written sale and assignment also does not make reference to any LLC. Rather, at the beginning of the document, the sale and assignment states that it is from "the entities listed on the signature pages hereto Marsha and Saul Azar (collectively "Assignor") . . . ." Then on the signature page the assignors are listed as "Marsha Azar, Illinois Energy & Company" and "Saul Azar, Illinois Energy & Co." Finally, in the attestations, it is stated that the person signing the agreement are "Marsha Azar dba Illinois Energy" and Saul Azar dba Illinois Energy." (Exs. P11 & D1; Doc. No.

---

[9] Another problem for the Azars is that Leland Oil is not a party to the July 2014 pumping agreement. In an attempt to get around this problem, Saul Azar in his affidavit offers only the vague statement that Bensun Energy had orally assured him Leland Oil was Bensun Energy's partner with respect to an agreement to be pumper for the well that it claims was evidenced by the written pumping agreement. The problems for that include: (1) the 2014 pumping agreement was in writing; (2) another North Dakota attorney retained by the Azars drafted it; (3) the agreement on its face appears to be complete; and (4) there is no reference in the written agreement of Leland Oil being obligated to perform vis-a-vis the Azars even though, when the Azars wanted to make sure that another party was obligated along with Bensun Energy, the agreement expressly provided for that.

66, pp. 28-29).

- The promissory note given for the purchase of the wells was made payable to Marsha and Saul Azar.  (Ex. P 9).  And, the check in satisfaction of the promissory note was made out to them.  (Ex. P. 12).

Notably, none of the documents directly involving the agreement for the sale of the two wells make a specific reference to a limited liability company with the name Illinois Energy, LLC and all of the documents name Marsha and Saul Azar, which would be unnecessary, if not contrary, to their business being a limited liability company.  Also noteworthy is Saul Azar's testimony at trial (including the snippet quoted earlier) the thrust of which was that "he" purchased the Davis State and the Sullivan and then sold them to Leland Oil And Bensun Energy; not once did he mention a limited liability company.  (Doc. No. 66, pp. 101-10).   Further, in the posttrial briefing and proposed findings and conclusions prepared by Azars' new counsel, there was no attempt to argue that the record before the court supported a conclusion that someone other than the Azars personally were liable.  (Doc. Nos. 67-68, 72).  Finally, no appeal was taken on the issue.

In terms of seeking extraordinary relief now, the Azars have again offered nothing of specificity in their affidavits that would suggest that the parties to the agreement for the sale of the wells understood and agreed that the seller was a limited liability company and not Marsha and Saul Azar.  Further, apart from what the parties agreed to in terms of who would be responsible (which is what governs), the Azars have no made showing that the Davis State and the Sullivan belonged to a limited liability company at the time of the sale in June 2012 by proffering such things as documents evidencing ownership of the wells, tax returns, etc.  In fact, there is no evidence that a limited liability company with the name of Illinois Energy, LLC was even in existence in June 2012

when the sale was consummated.

**B.  Contention that the court procedurally erred in entering the partial summary judgment**

The Azars claim the court erred in entering partial summary judgment by invoking the court's local rule that the failure to respond to a motion may be deemed an admission that the motion has merit.  The Azars contend that the court's local rule cannot trump the requirements of Fed. R. Civ. P. 56 and that the court was obligated at the time it ordered the partial summary judgment to expressly state why the motion was supported by the facts and the law notwithstanding the failure to respond.

The problems for this argument now, even if meritorious, are several.  First, as discussed later, the Azars had months after the trial and before the court made its finding and conclusions and entered judgment (during which they had already obtained new counsel) to bring this claimed error to the attention of the court.  They failed to do so not only then, but also failed to mention it in their posttrial briefing.  Second, the Azars had the opportunity to appeal and failed to do so.  As pointed out earlier, a Rule 60(b)(6) motion is no substitute for an appeal. Third, any error was harmless in several respects.  See Fed. R. Civ. P. 61; C. Wright, A. Miller, & M. Kane, 11 Federal Practice and Procedure § 2888 (The harmless error rule applies to 'any ruling order' and to 'anything done or omitted by the court or by the parties.'").  While the court did not explicitly discuss the facts or the law in its grant of partial summary judgment, plaintiffs did file supporting proof that was sufficient to support the grant of partial judgment (at least as far as it went), which the court reviewed prior to entering the order.  Also, because there was nothing in the court's order as to when the breach of the sales agreement took place or when any calculation of damages should begin to run, the court

essentially had to confront the issue of liability anew.[10] Finally, and more significantly now in terms of granting Rule 60(b)(6) relief, the Azars have failed to demonstrate any prejudice for the reasons already outlined.

### C. The Azars have not been diligent in seeking the extraordinary relief that they now seek

This case was tried on May 17, 2016. The Azars retained their present counsel shortly thereafter and, by July 19, 2016, the transcripts for the trial and the hearing held on the Azars' request for a continuance were available. However, it was not until mid July 2017, some fourteen months after the trial, that the Azars sought relief, even though the trial in this case was less than a full day and the complaints that the Azars now make are based on information that was known to them at the time.

Rule 60 provides in subsection (c)(1) that any motion brought pursuant to subsection (b) must be brought within a "reasonable time." While the reasons expressed above for denying the Azars' request for Rule 60(b)(6) relief are sufficient, their lack of diligence in seeking relief is also a reason for denial. While the court did not issue its decision on the case until February 27, 2017, the matters that the Azars now raise could have been raised earlier. Further, even putting that side, the Azars took more than four months from when the court issued its decision to file the present motion. There appears to be no good reason for why it could not have been filed much earlier. Cf. Travelers Ins. Co. v. Liljeberg Enterprises, Inc., 38 F.3d 1401, 1407-11 (5th Cir. 1994) (what is a reasonable time for bringing a motion to vacate a judgment pursuant to Rule 60(b)(6) depends upon

---

[10] The Azars contend that the court's partial grant of summary judgment foreclosed them from offering what they have claimed was critical evidence bearing on the issue of liability. Putting aside for the moment that even now the Azars have not proffered such evidence for the reasons already articulated, the record reflects that at no point did the court exclude evidence offered by the Azars based upon lack of relevancy. Further, and more material now, at no point did the court refuse to consider any offer of proof.

the facts and circumstances of the case, including taking into consideration the interest in finality, reasons for the delay, the ability of the moving party to learn earlier the grounds for the motion, and prejudice to the other parties).

### D. Request for an evidentiary hearing

The Azars have requested that the court hold an evidentiary hearing. However, the Azars have had a sufficient opportunity to make their case by way of affidavit, including the ability to proffer any relevant documentary evidence. Further, there is nothing in their affidavit testimony which suggests that an evidentiary hearing is going to change matters. For these reasons, this case should not be prolonged further. Plaintiffs are entitled to finality in the judgment that they expended significant resources to obtain.

## IV. ORDER

Based on the foregoing, the Azars' motion for Rule 60(b)(6) to vacate the judgment (Doc. No. 80) as well as their request for an evidentiary hearing (Doc. No. 87) are **DENIED**.

Dated this 25th day of September, 2017.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court